## THE UNITED STATES *vs.* BENJAMIN F. BIGELOW.

CRIMINAL DOCKET. No. 14,394.

{ Decided December 29, 1884.
{ The CHIEF JUSTICE and Justices MAC ARTHUR and JAMES sitting.

1. The courts of the United States are invested with power to determine conclusively in the trial of a criminal cause; when the interests of public justice require that the jury shall be discharged, and such a discharge is not in any sense equivalent to a verdict of acquittal, or a defence against a further trial upon the same or a new indictment.

2. But this discretionary power to discharge the jury during the course of a criminal trial is not to be understood as containing the slightest element of arbitrary choice. The discretion is one which the trial justice must use under a solemn obligation to satisfy his judgment that such a course is required by the interests of justice

3. Fourteen indictments were found against the defendant for embezzlement, to each of which he pleaded not guilty. Afterwards, at his instance, they were all consolidated and directed to be tried as one case. A jury was then impanelled and sworn, and the district attorney opened the case to the jury, stating what he expected to prove in relation to each and all of the indictments. After he had closed, and before any evidence was taken, the presiding justice, on his own motion and against the protest of the defendant, rescinded the order consolidating the indictments, discharged the jury and directed the district attorney to select one of the indictments for trial, which was done, and the same jury resworn. Whereupon the defendant pleaded *a·trefois acquit* which was overruled on demurrer and the trial proceeded with, and a verdict of guilty found. On appeal to the General Term it was held that this discharge of the jury was not equivalent to an acquittal, and was no defence to the second trial.

THE CASE is stated in the opinion.

A. S. WORTHINGTON and H. T. TAGGART for the United States.

WM. A. COOK and ROBERT CHRISTY for defendant.

Mr. Justice JAMES delivered the opinion of the court.

This cause was heard at the last term, but, on motion of defendant, a rehearing was granted, to be confined, according to his own suggestion, to the constitutional question supposed to be raised by the bills of exception.

The record shows that on November 14th, 1882, thirteen indictments were filed against the defendant, under the act

50

of February 4, 1878 (20 Stat., 23), and one indictment under section 5209 of the Revised Statutes of the United States. Section two of the act of February 4, 1878, provides: "That if any officer, clerk, agent or employee in the service of any person, firm, association or corporation shall, within the District of Columbia, embezzle or wrongfully convert to his own use, or fraudulently take, make way with, or secrete, with intent to embezzle or fraudulently convert to his own use, or shall knowingly and wilfully or wrongfully sell or dispose of any money * * * belonging to such person, firm, association or corporation which shall come into his possession or under his care by virtue of such office, clerk-ship, agency or employment, he shall, on conviction thereof, be *punished by a fine not exceeding* five thousand dollars, or by imprisonment not exceeding five years, or both." Section 5209 of the Revised Statutes relates to National Banks, and provides that: "Every president, director, cashier, teller, clerk or agent of any association, who embezzles, abstracts, or wilfully misapplies any of the moneys, funds or credits of the association, * * * or who makes any false entry in any book, report or statement of the association, with intent, in either case, to injure or defraud the association, * * * shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

By these indictments the defendant was charged with embezzling the moneys of the National Bank of the Republic, of Washington, and to each he pleaded "not guilty." Afterwards, on his instance, the fourteen indictments were consolidated. The first bill of exceptions shows that, on the issues thus made, a jury was empanelled and sworn on November 5, 1883; that after the Assistant United States District Attorney had opened the cases and stated in full what the United States expected and proposed to prove in relation to each and all of the indictments, and after the court had taken a recess of half an hour and reassembled, the presiding justice stated that the opening had surprised him, and that it would take a long time to try the cases; that the attorney for defendant "insisted that the cases

should go on and be tried on the issues made up;" that the court, on its own motion, ordered that the order of consolidation should be rescinded and the jury discharged, and that the United States should select one of the cases for trial, which was done; that the court required that the jury be resworn, and the trial proceeded with; which was done on the indictment selected, which was No. 14,394.

The second bill of exceptions shows that after these proceedings were had, namely, on the next day, the defendant, by leave of the court, filed a special plea, without withdrawing his plea of "not guilty." This plea, after setting forth the discharge of the jury, states that the court, against the objection and exception of defendant, "re-empanelled and reswore the jury to try again the same cause of action, to wit, one of the said indictments, and proceeded to try the same; * * * and said trial is now in progress, without any other or further plea having been made to the same by said defendant, than that interposed thereto by said defendant prior to said consolidation of the several indictments." It concludes as follows: "Wherefore, the said defendant says that he has been put on his trial a second time for the same offence, hereby alleging and showing that the trial now in progress is for the same identical offence as that from the consideration whereof the said jury was discharged as aforesaid. Wherefore, the said defendant prays that he may have this his plea of former acquittal, and of being twice put in jeopardy for the same offence, considered and allowed by the court, and placed on the files and entered as of record in said court, as a plea of *autrefois acquit* and former jeopardy "to the said indictment consolidated as aforesaid." To this plea the United States demurred, and the demurrer was sustained; the trial proceeded and resulted in a verdict of "guilty." The defendant filed and submitted a motion for a new trial, and in arrest of judgment, upon grounds set forth in forty-six separate specifications. The ground stated in the last of these was, "because the court had overruled the plea of the defendant of former jeopardy." At the former hearing of this cause, we held

that none of the other grounds was sufficient to sustain the motion, and we are still satisfied with that conclusion. The overruling of the plea of former jeopardy and *autrefois acquit* is therefore the only ground for the motion in arrest which remains to be considered.

The proposition which the defendant intended to present by his special plea and motion in arrest, was, that he was put in jeopardy immediately upon the swearing of the jury to try the consolidated indictments, and without the introduction of any evidence against him; and that, when the jury was discharged, and then resworn to try one of the indictments included in the consolidation, he was twice put in jeopardy for the same offence, in the sense of the Fifth Amendment of the Constitution of the United States, which declares that no person shall "be subject, for the same offence, to be twice put in jeopardy of life or limb."

The same or an equivalent provision is contained in the constitutions of most of the States, and its meaning has been interpreted as well by the State as the United States courts. Two very different methods of treating the language of the provision have been used, and conflicting conclusions have been reached. Under one method, some courts have interpreted the words literally, notwithstanding they have declined to apply the same treatment to the rest of the phrase, "of life or limb;" emphasis has been laid by them on the particular word "jeopardy," and they have devoted their attention to ascertaining when the *first* jeopardy begins. Their conclusion has been that, *when the jury is sworn,* the prisoner has reached the jeopardy from the repetition of which the constitutional rule protects him. Under the other method, the whole phrase, "twice in jeopardy of life or limb," has been treated as a technical expression, adopted from the common law; and the constitutional prohibition has been interpreted, on that ground, to mean only that no person shall be subject, for the same offence, to be *twice tried.* In its application the first of these interpretations includes the other, but it goes further. It holds, of course, that a person has been once in jeopardy, in the sense of the

Constitution, when he has been tried, and either acquitted or convicted; but it holds also that he has, in the sense of the same rule, been in jeopardy when certain proceedings have been had, which have not reached actual acquittal or conviction; and it fixes upon the swearing of the jury as such a proceeding. This interpretation, and the manner in which it has been maintained and applied, suggest some observations before we consider the weight of authorities on the subject. We propose to inquire whether it is maintainable on principle.

It is clear that the ground on which it asserts that jeopardy exists as soon as the jury is sworn must be, that there is then at once jeopardy of *an adverse verdict;* and it should appear how jeopardy of such a verdict can lawfully exist before evidence has been introduced. What is the position of the jury, under our practice, at that stage of the proceedings; and what would it be even if the old formality of a charge by the clerk were added after the oath? The processes of impaneling and swearing them have only the effect to organize and qualify the tribunal by which the prisoner is to be tried, and the charge had only the effect to inform them of the nature of the duty they were to perform in that trial. In either case they are only *ready* for the performance of their functions; but they have not thereby begun their actual performance. Jeopardy that they may give an adverse verdict cannot well exist before they have reached the power to consider whether to give such a verdict, or whether any fact leads toward it; and, both by the common law, and under the express provisions of our Constitution, they have no such power before any proof is presented for their consideration. So much was imported even by the formal charge, which recognized the limitations of their power, while it informed them of their duty. They were told by it what they were to inquire of, and the last words were: "Hear your evidence." In effect, they were informed that their inquiry was to be, whether *the evidence proved* the prisoner to be guilty, and their power was to find him guilty only upon such an inquiry. But the prohibitions of the

common law bore directly on this point.   As we learn even from Magna Charta, the common law secures the accused from being deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land; and this, as Coke explained in 2 Ins., 50, 51, means due process of law, in which is included "presentment or indictment, and being brought in to *answer thereto;*" and this, as Mr. Justice Curtis said in Greene *vs.* Briggs, 1 Curtis C. C., 326, includes the consequent right to be discharged unless the charge *is proved.*   These rules of the common law not only forbid conviction without proof, but forbid any consideration of conviction until proof is presented.   At this stage of the proceedings, the law says, in effect, to the jury: "You are now informed of your functions, and are sworn to perform them faithfully ; when the 'inquiry' begins, you will begin to consider its steps; until then, your function has not begun." But the protection afforded by our Constitution against the existence of jeopardy immediately upon the swearing of the jury, is still more complete.   While the Fifth Amendment declares, as did the common law, that no person shall be deprived of life, liberty or property without due process of law, the Sixth provides that "in all criminal prosecutions the accused shall enjoy the right  *·  *  to be confronted with the witnesses against him," and "to have compulsory process for obtaining witnesses in his favor."   The provision for confronting the witnesses who were to prove his guilt would, if it had stood alone, have imported that proof by witnesses was an indispensable condition to an adverse verdict, when the charge is denied; and that no power was given to the jury to find such a verdict otherwise; but the provision for due process of law, which means here what it meant at common law, is an express declaration that no person shall be deprived of life or liberty without proof; in other words, that without proof there *shall not be a verdict* against life or liberty.   As we have already said, a rule which forbids an adverse verdict without proof, forbids also the consideration of the question whether there shall be such a verdict; and this inability to consider an adverse verdict,

applies as well to the time before any proof is presented as to a total failure to present any proof. We hold, then, that there cannot at that time be any legal jeopardy of a verdict which the jury have at that time no power to consider.

We find this view, as to the time when the function of the jury begins, incidentally confirmed by the terms in which Blackstone lays down the rule as to discharging the jury, which has been so much relied on in all the cases which maintain this contention. He says: "When the evidence on both sides is closed, indeed *where any evidence hath been given,* the jury cannot be discharged (unless in cases of evident necessity) till they have given in their verdict." 4 Bl., 360. Brief as is this statement, it is clear that the principle which the commentator had in mind was, that the jury should not be interrupted in the performance of their function, unless in cases of necessity ; and it is equally clear that in his opinion that function did not begin until some evidence was presented for their consideration.

But this contention has been rested on a particular proposition in which immediate power of deliberation has no part. It is claimed that when the jury are formally "charged with the prisoner," or, under our simpler practice, when they are only sworn, *the trial has thereby begun ;* and the argument from this assertion seems to be, that, the trial being one entire proceeding, which may end in an adverse verdict, jeopardy of such a verdict exists from the beginning of that proceeding. In McFadden *vs.* The Commonwealth, 23 Penn. State Rep., 12, Black, C. J., said: "When does the trial begin ? Not, properly, until the jury is charged with the prisoner. But the practice of formally charging the jury is not generally observed in the courts of this State, and we cannot refuse a party any of the rights which he would otherwise have, merely because a form is omitted by the public officers. We must, therefore, hold that the jury has the prisoner in charge when a full jury is impanelled and all the jurors are sworn." In effect, the court held that the trial is begun when the jury is sworn, and that thereupon the prisoner is in jeopardy. In reference to some other mat-

ters, and in a general sense, it may be exact enough to say that the trial has then begun; but here the particular question is, what is the position of the jury in reference to the beginning of the trial; and this question demands greater precision. With the utmost respect for the high authorities who have used similar language, we are of opinion that, in the sense of this question, it cannot be said that the *trial* has begun, either when the jury is sworn or when it is formally charged. When the Constitution provides, as the common law had done, that trial shall be by jury, it is unintelligible that the qualification of the jury for a trial should constitute in any sense a part of the process of trying which is to be done by them. A proceeding has begun, but not yet the jury's work, nor any of their powers. It is said, however, that the trial began with the charge, and that, under our practice, the oath of the jury should have an equivalent effect. It is important, therefore, to consider whether there was actually anything in the formality of charging the jury which made it a part of the trial by the jury, or caused their relation to the trial to be different from what it was after they had merely been sworn. For this purpose it is necessary to state these formalities fully. First, the oath was administered in this form: "You shall well and truly try, and true deliverance make between our sovereign lord the king and the prisoner at the bar, whom you shall have in charge, and a true verdict give, according to the evidence," &c. Then, after the cryer's proclamation, the clerk said to the jury: "Look upon the prisoner, you that are sworn, and hearken to his case. A B stands indicted by the name of A B, &c. (reading the indictment). Upon this indictment he hath been arraigned; upon this arraignment he pleaded not guilty, and for his trial hath put himself upon God and his country, which country you are; so that *your charge is to inquire* whether he be guilty of the felony whereof he stands indicted, or not guilty; if you find him guilty, you shall inquire what lands, tenements, goods and chattels he had at the time of the felony committed, or at any time since; if you find him not guilty, then

you shall inquire if he did fly for it or not; if you find that he did fly for it, then you shall inquire what goods and chattels he had at the time he did fly for it, or at any time since; if you find him not guilty, and that he did not fly for it, say so and no more. Hear your evidence."

It is always said with great emphasis that by this formality the jury come to have the prisoner in charge, and a grim notion is suggested that he is necessarily in jeopardy until he escapes from their clutches. But the name by which text writers or judges describe a proceeding is not necessarily an analysis of its nature or effect, and we find nothing in this formula but definite information as to the work upon which the jury are about to enter, but upon which they have not yet entered. They now know what they have to try, but the trial yet lies before them. When "their evidence," in the language of the charge, begins, then their function begins, but not till then. Whether that function shall ever begin—in other words, whether it shall ever be in their *power* to consider the question of an adverse verdict—depends, not upon anything under their own control, but upon the happening of that next step, the introduction of evidence. It follows that the very existence of any jeopardy of an adverse verdict depends upon the happening of a condition precedent; and, therefore, that such jeopardy cannot be said to exist immediately upon either the swearing or the charging of the jury.

We have next to observe that the same courts which hold that jeopardy is reached when the jury is sworn, universally hold also that, under certain circumstances, the jury may be discharged and the accused put again on trial for the same offence, either upon a *venire de novo* or a new indictment. They are not in harmony as to the circumstances under which this may be done, but all of them agree that it may be done if the trial is interrupted by the illness of the judge, or a juror, or the prisoner. As to other causes of discharge there has been a conflict of opinion, but most of them now concede that the jury may be discharged, and another trial had, if it is properly shown that they could

not agree upon a verdict. But whatever the conceded ground of discharge may be, all of the courts which hold that jeopardy, in the sense of the Constitution, is reached when the jury is sworn, hold necessarily that, in a case of proper discharge, the prisoner had never been in jeopardy. If jeopardy does begin with the swearing of the jury, it is difficult to understand how a subsequent event, which merely prevented its final effect, shows that it never began. As a solution of this obvious difficulty it has been suggested, however, that the cause of the discharge may be considered to have been an inherent defect from · the beginning; but that solution merely proposes to imagine what is not true, and we think that the two propositions are simply irreconcilable. Let us take, for example, the case of a discharge because the jury cannot agree upon a verdict. To say that jeopardy of life is reached when the jury is sworn, means, as we have already said, that there is then jeopardy that the jury *may* agree upon a verdict against life; and it is impossible that it should be part of the same theory that there had been no jeopardy of such agreement, because they found themselves in the end unable to agree upon any verdict. If the jeopardy begins as alleged, it is an essential part of it that they may be *able to agree,* as well as that their agreement may be adverse. There are three things, as to this matter, which a jury may lawfully do: they may agree upon a verdict of conviction, they may agree upon a verdict of acquittal, or they may not agree upon a verdict at all; and if jeopardy begins as soon as they are sworn, that jeopardy must consist of the very fact that, of these three things, they *may* do the first, notwithstanding they may, on the other hand, do the last. How does the fact that, when they come to consider the evidence, they find themselves unable to agree at all, show that there never was any peril that they might take a different view of that evidence, and find it conclusive of guilt? What has the actual result to do with the question whether there had been jeopardy that · the jury might do otherwise? If the jeopardy referred to by the Constitution actually does exist as soon as the jury is

sworn, it exists at the moment of their discharge, and the Constitution would forbid a further trial in these very excepted cases. But it is now as generally conceded by courts which hold this theory, as by those which deny it, that in all cases of proper discharge of the jury, including cases of disagreement, the constitutional rule permits a further trial; and this concession, as we think, simply discredits and surrenders the proposition that jeopardy, in the sense of the Constitution, is reached as soon as the jury is sworn.

Again, this proposition seems to be discredited, and even ignored, by the very form in which the defence of former jeopardy is stated in the authorities to which we refer. All of them stand upon the ground that an improper discharge of the jury is equivalent to *an acquittal*; and this is formulated as the constitutional reason why a further trial is forbidden. Now, this objection does not mean that the prisoner had been in former jeopardy by being merely put on trial, placed before a sworn jury; but that, in contemplation of law, he had been *tried* and consequently acquitted. The defence stands upon the prisoner's alleged *right to a verdict* in the first proceedings, on the principle that an unlawful denial of that right cannot affect the benefit which should accrue to the prisoner from its actual enjoyment. This mode of presenting the defence of former jeopardy implies that the true meaning of the constitutional prohibition is, that no person shall be subject to be twice *tried* for the same offence, and that the former jeopardy is the jeopardy incurred in passing through a complete trial. These implications appear very strikingly in a passage of Judge Cooley's Principles of Constitutional Law, pp. 296, 297, to which our attention was called on the part of the defendant. The learned author there says: "The Fifth Amendment forbids that any person shall be subject, for the same offence, to be twice put in jeopardy of life or limb. This is an old phrase which has come down from times when sanguinary punishments were common; but the meaning is that no person shall be put on trial a second time for the same offence, after he has been tried and convicted or acquitted. But

some explanation is necessary, since in some cases one may be entitled to the benefits of an acquittal though a verdict has never been returned." He then explains, as follows, how a case in which there has been no verdict may come within the constitutional rule thus interpreted: "A person is in jeopardy when he is put upon trial before a court of competent jurisdiction, upon an indictment or information which is sufficient in form and substance to sustain a conviction, and a jury has been empanelled and sworn to try him. The accused then becomes entitled to a verdict that shall forever protect him against any future prosecution, and a discharge of the jury without his consent is equivalent to an acquittal, except in a few cases in which a discharge without a verdict becomes a necessity." Notwithstanding his statement that " a person is in jeopardy when * * * a jury is empanelled and sworn to try him," the learned commentator distinctly rests the defence of former jeopardy upon the fact of former trial and verdict, or what he claims to be their legal equivalent. We trust we do no injustice to his several propositions in saying that, when analyzed, they seem to contain a contradiction. When he says that the constitutional rule against being put "twice in jeopardy " means that the accused shall not be again put on trial after he has been already tried, and either convicted or acquitted, we understand him to say substantially that a case of former jeopardy exists, in the sense of the Constitution, only when the accused has been tried, or may be said to have been tried. He then asserts, in explaining when the accused may be said to have been tried, that, in the sense of the same rule, a case of jeopardy, and therefore of former jeopardy, existed as soon as the accused was put on trial. It is from *this* jeopardy, as we understand him, that he deduces the prisoner's right to a verdict; then, having demonstrated this right, he claims that a denial of it is equivalent to an acquittal, and seems to conclude that now at last the case of former jeopardy, in the sense of the Constitution, exists. If it is to be arrived at in this way, it can hardly be said at the same time to have existed on the swearing of the jury.

Whether the prisoner's right to insist upon a verdict does depend upon the proposition that he is already in jeopardy, and whether the denial of a verdict is, in the sense of the Constitution, equivalent to a verdict of acquittal, remain to be considered in another place. For the present, we refer to this and similar explanations of the ground on which a further trial is allowed after a discharge of the jury, only as showing that they seem to concede practically that the true meaning of the constitutional prohibition is, that no person shall be subject to be tried again for the same offence, after he has been already *tried;* and that the former jeopardy—if two distinct jeopardies are to be counted—is the jeopardy involved in a complete trial; complete either in fact or in contemplation of law.

The proposition which we have examined has assumed, in the American cases, the burden of maintaining itself on principle, and we conceive that that burden properly belongs to it. We have, therefore, treated it as an original question, and are led to the conclusion that on principle the doctrine that jeopardy is reached as soon as the jury are sworn, and without the introduction of evidence, is not maintainable. On the other hand, we are of opinion that the contrary interpretation of the constitutional rule, to which we have referred, is established by authorities by which we are bound.

The first interpretation of this clause of the Amendments was by the legislature. Of course, the constitutional protection was meant to extend to persons in the land and naval forces, as well as to other persons. This is necessarily true on broad principle, and is shown expressly to have been the intention of the Fifth Amendment by its context; for persons in those forces are specially excepted from one of its clauses, but from none of the others. Therefore, when Congress undertook to express one of these protections in the articles for the government of the army, it was their constitutional duty, and must have been their intention, to extend it completely and in its fullest measure. The form in which the particular protection under consideration was stated in

the 87th article, by the act of April 10th, 1806, was, that no officer, soldier, &c., "shall be *tried* a second time for the same offence." This enactment was the work of men who were in public life when the Amendment was adopted, and who were cognizant of the discussions attending it. Their almost contemporaneous interpretation of its meaning is therefore important; as is the further fact that this form has stood unaltered from that time, for now nearly eighty years, as the unquestioned equivalent of the constitutional provision.

In 1820, the meaning of this clause was considered by the Supreme Court of New York in the People *vs.* Goodwin, 18 Johns. Rep., 188. We find the following passage in the opinion of the court: "The question, then, recurs, what is the meaning of the rule that no person shall be subject, for the same offence, to be twice put in jeopardy of life or limb? Upon the fullest consideration which I have been able to bestow on the subject, I am satisfied that it means no more than this: that no man shall be twice tried for the same offence. * * * Much stress has been placed upon the fact that the defendant was in jeopardy during the time the jury were deliberating; it is true that his situation was critical; and there was, as regards him, danger that the jury might agree on a verdict, but in a legal sense he was not in jeopardy, so that it would exonerate him from another trial. He has not been tried for the offence imputed to him; to render the trial complete and perfect, there should have been a verdict either for or against him. In a legal sense, therefore, a defendant is not once put in jeopardy until the verdict of the jury is rendered for or against him, and if for or against him, he can never be drawn in question again for the same offence." This case is referred to, not on the ground of its superior authority to the decisions of other State courts, but on account of reference to and approval of it in later decisions of United States courts. Three years afterwards, Mr. Justice Washington, sitting in the Circuit Court for Pennsylvania, in the case of United States *vs.* Hasskell, 4 Wash. Cir. Ct. Rep., 402, considered a plea similar to that

presented in the case before us. For the present, we shall
cite only that part of the opinion which relates to the mean-
ing of the Fifth Amendment. "It is contended," said the
court, "that, although the court may discharge in cases of
misdemeanor, they have no such authority in capital cases;
and the Fifth Amendment to the Constitution of the United
States is relied upon as justifying the distinction. We think
otherwise; because we are clearly of opinion that the *jeopardy*
spoken of in this article can be interpreted to mean nothing
short of the acquittal or conviction of the prisoner; and the
judgment of the court thereupon. This was the meaning
affixed to the expression by the common law, notwithstand-
ing some loose expressions to be found in some elementary
treatises, or in the opinions of some judges, which would
seem to intimate a different opinion. Upon this subject, we
concur in the opinion expressed by the Supreme Court of
New York in Goodwin's case, although the opinion of the
Supreme Court of this State in Cook's case is otherwise.
We are, in short, of opinion, that the moment it is admitted
that in cases of necessity the court is authorized to discharge
the jury, the whole argument for applying this article of
the Constitution to a discharge of the jury before conviction
and judgment is abandoned, because the exception of neces-
sity is not to be found in any part of the Constitution; and
I should consider this court as stepping beyond its duty in
interpolating it into that instrument, if the article of the
Constitution is applicable to a case of this kind. We admit
the exception, but we do it because that article does not
apply to a jeopardy short of conviction."

A few months later, at the February Term, 1824, the ques-
tion whether a prisoner could again be put on trial for a
capital offence after the jury had been discharged because
they were unable to agree, came before the Supreme Court
of the United States, upon certificate of division, in the case
of United States *vs.* Perez, 9 Wheat., 579. It is to be re-
membered, in estimating the meaning and force of this
case, that Mr. Justice Washington sat in it; it is probable
that he understood the brief opinion delivered by Mr. Jus-

tice·Story to come up fully to his own emphatic view of this question. The court said in Perez's case: "We are of opinion that the facts constitute no legal bar to a future trial. *The prisoner has not been convicted or acquitted*, and may again be put upon his defence." As Mr. Justice Story himself remarked, in the later case of United States *vs.* Gilbert, 2 Sumner, 56, "the court did not go into any exposition of the clause of the Constitution now under consideration; but simply stated that in the case of Perez, the prisoner had not been convicted or acquitted, and *therefore* might again be put upon his defence." Notwithstanding the absence of exposition, this simple statement of the reason why the prisoner might again be put on trial, seems to us to be a most effective declaration of the test of the liability of a prisoner to be put again on trial was, whether he had been convicted or acquitted already. The question whether a discharge of a jury might amount to an acquittal, was not touched by this part of the opinion. That question remains to be considered in its proper place; but the important point at present is that the Supreme Court, by applying the test of former acquittal or conviction, recognized the same interpretation of this clause of the Constitution which had so recently been given by one of its members. And any doubt as to what Mr. Justice Story understood himself to have said or meant by his opinion, would seem to be settled by his statement of the law on this subject afterwards in his work on the Constitution. It is to be observed that the first edition of this treatise appeared in 1833, only nine years after the decision of Perez's case, and was dedicated to Chief Justice Marshal, who also sat in that case. He must have understood himself to state their common opinion. In section 1787 of the Commentaries, he said of this clause: "The meaning of it is, that a party shall not be tried a second time for the same offence after he has once been convicted or acquitted of the offence charged by the verdict of a jury, and a judgment has passed thereon for or against him. But it does not mean that he shall not be tried for the offence a second time if the jury have been discharged without

giving a verdict; or if, having given a verdict, judgment has been arrested upon it, or a new trial has been granted in his favor; for in such a case his life or limb cannot judicially be said to have been put in jeopardy." We are aware that, in the later case of United States *vs.* Gilbert, 2 Sumner, 19, where he held that this clause forbade a new trial after conviction, even at the prisoner's instance—a decision which is not followed—Judge Story impaired by some observations the authority of his treatise. He dissented emphatically from Judge Washington's opinion as to the necessity of a judgment as well as a verdict, in order to bring a case within this provision, but we do not understand him to depart from the main proposition of his text, that the meaning of this clause is, that a person shall not be subject to be tried again, after having been once tried. Whatever may be said, however, of Judge Story's later views, we have ourselves no doubt about the effect of the decision in Perez's case. When the court gave, as the reason why the prisoner might again be put on trial after a jury in his case had been discharged, the fact that he had neither been convicted nor acquitted, they meant that the test of liability to be so put on trial was, whether there had been a former trial.

In *Ex parte* Lange, 18 Wall., 163, it was held by the majority of the court, Clifford dissenting, that, by the action of the circuit court the petitioner was undergoing punishment a second time for the same offence, and that such a case was within the spirit of the clause in question. The case did not call for a complete exposition of this clause, or of the particular question now under consideration; but it is of importance that the court took, *arguendo*, the same view of the scope of this provision which we have found in the cases and authorities referred to. Mr. Justice Miller, delivering the opinion, said: "In the case of The Commonwealth *vs.* Olds, 5 Littell, 137, one of the best common law judges that ever sat on the bench of the Court of Appeals of Kentucky, remarked, 'that every person acquainted with the history of governments must know that state trials have been employed as a formidable engine in the hands of a domi-

52

nant administration. * * * To prevent this mischief the ancient common law, as well as Magna Charta itself, *provided that one acquittal or conviction should satisfy the law;* or, in other words, that the accused should always have the right secured to him of availing himself of the pleas of *autrefois acquit* and *autrefois convict.* To perpetuate this wise rule, so favorable and necessary to the liberty of the citizen in a government like ours, so frequently subject to changes in popular feeling and sentiment, was the design of introducing into our Constitution the clause in question.'" Besides quoting this passage with approval, Mr. Justice Miller used other expressions of his own to the same purport. "Of what avail," he asked, "*is the constitutional protection against more than one trial,* if there can be any number of sentences pronounced on the same verdict?" And again: "We do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it. But there is a class of cases in which a second trial is had without violating this principle. As when the jury fail to agree and no verdict has been rendered," &c. Here the principle is distinctly recognized that a further trial, after a discharge for non-agreement, is not a violation of the Constitution, because the case has not yet been tried. While Mr. Justice Clifford dissented from the conclusions of the majority, he was more emphatic in expressing the same view of this provision. After citing as authority Judge Story's Commentaries, to which we have referred, he added: "What is meant by the clause 'twice put in jeopardy of life or limb' has been judicially defined. * * * It means that a party shall not be tried a second time for the same offence after he has once been acquitted or convicted, unless the judgment has been arrested, or a new trial has been granted, on motion of the party."

In view of these recent expressions delivered in a case in which the court proposed, in favor of the defendant, to give the most liberal application to the clause in question, we think there can be little doubt about the opinion of the

court as to the meaning of the earlier case. The meaning which we have imputed to Perez's case is clearly recognized in *Ex parte* Lange. And we may add that we are the more assured that this has been the settled doctrine of the Supreme Court, because we are of opinion that, when this formula was introduced into the Constitution, it was understood at the common law to be merely the equivalent of the rule that no person should be *twice tried* for the same offence; "notwithstanding," as Mr. Justice Washington said, in Hasksell's case, "some loose expressions to be found in some elementary treatises, or in the opinon of some judges, which would seem to intimate a different opinion." We have not omitted to consider the line of authorities which have so often been arrayed on both sides of this question; but, as the entire history of the subject has been examined with thorough and exhaustive learning in recent English cases, by judges whose competence to determine what the common law has been will not be questioned, it would be affectation to enter here upon original research; and it is enough to state their conclusions. In Queen *vs.* Charlesworth, 1 Best & Smith, Q. B., 507, Chief Justice Cockburn said: "When we talk of a man being twice tried, we mean a trial which proceeds to its legitimate and lawful conclusion by verdict; and when we speak of a man being twice put in jeopardy, we mean put in jeopardy by the verdict of a jury; and he is not tried or put in jeopardy until the verdict is given." Afterwards, in Winsor *vs.* The Queen, 1 Q. B., 311, he said: "It has been urged upon us that according to the law of England no man ought to be put in peril twice on the same charge. I entirely agree. But we must apply that great fundamental maxim of the criminal law according to its true meaning. It means this: a man shall not twice be put in peril after a verdict has been returned by the jury; that verdict being given on a good indictment, one on which the prisoner could be legally convicted and sentenced." The same conclusion had been elaborately demonstrated by Crampton, J., in Conway and Lynch *vs.* The Queen, 7 Irish Law R., 178, 179, and his reasoning was

approved by all of the judges who sat in Winsor *vs.* The Queen. In Winsor *vs.* The Queen, Lush, J., in commenting upon the objection that the prisoner could not again be put on trial, did not even mention the phrase "twice in jeopardy." He said: "It is alleged that to put a person under these circumstances on a second trial is a violation of a well known maxim of the law, that a man shall not be *twice vexed* for one and the same offence." He thus assumed that the maxim against double jeopardy and the maxim *non bis vexari* were equivalent, and then, as to the latter, proceeded to say: "The meaning of the maxim is that, where the matter has been once litigated and brought to an end by means of the proceedings having gone to a termination, the verdict or judgment shall be a bar to second trial or litigation upon the same matter. * * * Now it is sought to engraft upon that maxim another meaning, and to argue that where the first trial had become abortive and had never gone on to its termination, it should still be a bar to a second trial for the same cause." In same case Blackburn, J., had applied the test of *res adjudicata.*

We are satisfied by these authorities, both American and English, that, at the time of the adoption of the Constitution, the rule that no person should be subject, for the same offence, to be twice put in jeopardy of life or limb, was understood by the common law to be only equivalent to the rule which forbade that any person should be twice tried for the same offence, and that this is the meaning of our constitutional rule. In the rest of our inquiry we shall proceed on that ground. We come next, therefore, to the question whether there is any case where a discharge of the jury without a verdict is, in the sense of this constitutional rule, the legal equivalent of a trial and verdict of acquittal, and thus a bar to a future trial for the same offence.

The defendant's general proposition may be formulated as follows: When the Fifth Amendment was adopted the common law had determined definitively when a jury might properly be discharged; it treated an improper discharge as a trial and acquittal; and these rules for determining when

a person should be regarded as having been tried, were by implication embodied in our constitutional provision. We have therefore to consider whether there was any fixed rule as to the discharge of the jury before they had given a verdict; whether a discharge in disregard of that rule was by the common law equivalent to a verdict of acquittal, and thus a bar to a future trial; and whether these rules were by implication incorporated in the Constitution. This leads us to inquire into the history of the rule as to discharges. It will be found that it had fluctuated before the adoption of the Fifth Amendment, and was not then fixed.

In that highly respected treatise, called Doctor and Student, first published in 1523, we find the following passage: "If the case happen * * that the jury can in no wise agree in their verdict, and that appeareth to the justices by examination, the justices may in that case suffer them to have both meat and drink, for a time, to see whether they will agree, and if they will in no wise agree, I think that the justices may set such order in the matter as shall seem to them by their discretion to stand with reason and conscience, *by awarding of a new inquest,* and by setting a fine on them that they shall find in default, or otherwise, as they shall think best, by their discretion, like as they may do if one of the jury shall die before verdict, or if any other like casualties fall in that behalf." Dialogue II, ch. 52. This, as Crampton, J., said in Conway and Lynch *vs.* The Queen, 7 Ir. Law R., 177, is "no mean authority." There can be no question that the power was exercised at the discretion of the judges, as here stated. Yet Coke afterwards laid down a very different rule in the most absolute terms. In 1st Institute, 227*b*, he said that "a jury sworn and charged in a case of life or limb, cannot be discharged by the court, but they ought to give a verdict;" and in 3 Institute, 110, that "if a person be indicted for treason, felony, or larceny, and plead not guilty, and thereupon a jury is returned and sworn, their verdict must be heard, and they cannot be discharged." Chief Justice Cockburn spoke very moderately when he said, in Queen *vs.* Charlesworth, 1 Best & Smith,

500: "Looking at the passage in Doctor and Student, we are led strongly to surmise that a different practice existed before the time when Coke wrote. It is to be observed, that Coke's rule wholly denies the power to discharge, and that he makes no exception of cases of necessity. If it was a correct statement of the general practice in his time, that rule would seem not to have prevailed very long, as we learn from Hale's unquestionable authority. That learned writer and judge says : " By the ancient law, if the jury sworn had been once particularly charged with a prisoner, as before is showed, it was commonly held they must give up their verdict, and they could not be discharged before their verdict was given up, and so is my Lord Coke.   *   *   But yet the contrary course hath *for a long time* obtained at Newgate, and nothing is more ordinary than after the jury sworn and charged with a prisoner, and evidence given ; yet if it appear to the court that some of the evidence is kept back or taken off, or that there may be a fuller discovery, and the offence notorious, as murder or burglary, and the evidence, though not sufficient to convict the prisoner, yet gives the court a great and strong suspicion of his guilt, the court may discharge the jury of the prisoner and remit him to the jail for further evidence ; and accordingly it hath been practiced in most circuits of England; for otherwise many notorious murders and burglaries may pass unpunished by the acquittal of a person probably guilty, where the full evidence is not searched or given." Hale's P. C., 294* and 295*. Now, it is entirely immaterial whether this practice was a safe one, or whether it proved in the end to be dangerous. The question is, whether it was generally recognized by the judges of England to be lawful; and there can be no question that it was so held. We observe that, inasmuch as it actually proved to be dangerous, and was ultimately used for political oppression, it has not unfrequently been spoken of in terms which imply that it was a deliberate and tyrannical subversion of a known rule of the common law; but Cockburn, C. J., has well pointed out in Charlesworth's case (1 Best & S., 500), that it " was a practice anterior by many

years to the time when its abuse caused it to be brought into question;" and he added that, "though, in the case of Whitebread and Fenwick, 7 How. St. Tr., 315, this practice of discharging the jury, for the purpose of furthering the administration of justice and preventing its frustration, was converted into an engine of party and political oppression by Chief Justice Scroggs and his fellow-justices, yet it is a mistake to say that Scroggs and his associates violated the law when Whitebread and Fenwick were put on their trial a second time; they only did what Lord Hale and other most virtuous judges had treated as the law, and adminis-tered as such." It is clear, then, that the law permitted a discharge of the jury even in capital cases precisely as Lord Hale has stated; and that in his time it was a legitimate exercise of discretion to take this course in order to allow a better preparation of proof, if the court found in the evidence at the first trial good reason to suspect the prisoner's guilt.

Inevitably this practice led to a judicial reaction, and hence, undoubtedly, came the consultation among the judges mentioned in Carthew, 465; S. C., Holt, 403. The author-ity of this report of the matter is said by Foster to have been questioned by the court in the Kinlochs case; but Cockburn accepted it in Charlesworth's case, 1 Best & S., 501. The statement is, that the judges, "upon debate among themselves," came to three resolutions: "1. That in capital cases a juror cannot be withdrawn, though all parties con-sent to it. 2. That in criminal cases, not capital, a juror may be withdrawn if both parties consent, but not other-wise. 3. And that in all civil causes a juror cannot be with-drawn but by consent of all parties." These rules are recog-nized in 10 Vin. Abr., c. 4; 1 Salk., 201, and 7 Mod., 1. It appears to be clear enough that these resolutions were not taken in the decision of a case, but simply upon consulta-tion of the judges, with a view to establish a better and safer rule. All of them were afterwards disregarded; the first one in the Kinloch's case, Foster C. C., 16–21, which occurred among the trials under the commission after the rebellion of

1745. Ten judges sat in that case, and nine of them agreed that judgment ought to pass upon the prisoners, nothwithstanding there had been a discharge of the jury. "They agreed," says Foster, "that, admitting the rule laid down by Coke to be *a good general rule*, yet it cannot be universally binding, nor is it easy to lay down any rule that will be so." Foster delivered a concurring opinion, and said: "The general question is a point of great difficulty and of weighty importance, and I take it to be one of those questions which are not capable of being determined by any general rule that hath hitherto been laid down, or possibly ever may be. For I think it is impossible to fix upon any single rule which can be made, to govern the infinite variety of cases which may come under this general question, without manifest absurdity, and in some instances without the highest injustice." Such language as this could not have been used, if it had been understood that the rule on the subject of discharge stood on the footing of a rule of the common law, or that it was fixed and settled even as a rule of practice. It was the language of judges who knew that the matter belonged to the province of judicial discretion.

About twenty-three years after the Kinlochs case, Blackstone published the fourth volume of his Commentaries, and here we find another attempt to formulate a rule. He says: "When the evidence on both sides is closed, and indeed when any evidence hath been given, the jury cannot be discharged, unless in cases of evident necessity, till they have given in their verdict." 4 Black., 360. It will be observed that Blackstone's rule differs from Coke's in two important respects; first, in forbidding the discharge only in case evidence has been introduced, and, secondly, in allowing it in cases of necessity. We are aware that an attempt has been made to reconcile them as to the latter point, by suggesting that in Coke's rule the exception of a case of necessity is to be implied; but it is plain that Coke himself intended to state the rule absolutely. But, finally, even this last formula laid down by Blackstone has not been followed either in England or in this country. After quoting

·it, Cockburn said abruptly, in Charlesworth's case: "I say that is not a true exposition of the law as practised in our time." We are aware that the reluctance of the courts to break away from a precise statement of any rule has caused ·them to explain that their discharge of a jury was done under what should be considered circumstances of necessity·; but it is plain that they were compelled to explain away the force of words, and that they practically emancipated themselves from Blackstone's rule of necessity. They have discharged juries, not because they were obliged to do so, but because it was for the interests of justice to do so.

Now, can it be said, in view of these variations in the rule and practice as to discharging juries, which continued down to a period so nearly preceding the adoption of our Constitution, that there was then a fixed and universally known rule of the common law on that subject; or that the rule could be called in any proper sense a rule of the common law at all? This whole subject has, as we have already said, undergone a thorough investigation in recent English cases, and conclusions touching this question have been pronounced by judges whose knowledge and judgment of the history of the common law cannot well be questioned. After such an examination, Cockburn, C. J., said, in Charlesworth's case, 1 Best & S., 498: "I apprehend that in no part of our procedure has the practice of the courts more fluctuated than in relation to the practice of the discharge of the jury in criminal trials;" and in Winsor's case, 1 Q. B., 301, he said: "We are dealing here, not with one of those principles that lie at the foundation of our law, such· as the maxim that judges shall decide questions of law, and juries questions of fact; or, that the verdict of the jury, in order to be binding, must be unanimous; we are dealing with ·a *matter of practice,* which has fluctuated at various times, and which, even at the present day, may perhaps not be considered as settled." And in Conway and Lynch's case, even the judges who applied Blackstone's rule strictly, and sustained a plea like that before us, spoke of the history of the rule in the same manner. Perrin, J., said: "That the rule

53

upon this very important question has been varied from time to time, either qualified, corrected or differently understood, is unquestionable." 7 Ir. L. R., 161. And Pennefather, C. J., said: "We have heard mentioned the common law principles that did govern the rule that existed upon the subject; but I will not go through the various modes and gradations that took place with regard to the practice in the administration of justice connected with this subject. There were undoubtedly general rules laid down, which were afterwards found, if not absolutely necessary, at least it was found expedient to make a modification in. That there were extravagant rules existing, connected with this subject, which for many years were carried into execution, cannot be denied. I think no man can now say that these rules ought, consistently with justice or common sense, to be any longer the law of the land; but are we at liberty, therefore, to consider or treat them as totally abolished?" Then, in speaking of Blackstone's rule, he said: "At that time *the better sense* of succeeding periods produced this qualification in the rule then and theretofore laid down." The legal import of these remarks is unmistakable. Both of these judges treated what they called a rule of law as having been a rule of practice, subject to alteration according to the "better sense" of the courts. And it seems to be clear that this rule has not effectively assumed at any time to be a rule of the common law in the sense which is necessarily insisted on when it is said to be an implied term of our constitutional rule. Its very fluctuations lead to the conclusion that, as formulated at different times, it only purported to be an effort of the judges to lay down a guide for judicial discretion; that it was nothing more than a rule of practice, subject to judicial control, and in its nature liable to change in order to meet exigencies as they should arise. We think, therefore, that the first part of defendant's proposition, as we have formulated it, namely, that when the Fifth Amendment was adopted there was a definitive rule of the common law which determined when a jury might properly be discharged, is not maintainable. Of course it follows that, if

there was no such definitive rule, but only a judicial practice; necessarily and actually fluctuating, it is not admissible to assume that this fluctuating rule of practice was, in contemplation of the Constitution, a fixed and positive rule. And as the proposition that an improper discharge of the jury is, in the sense of the Constitution, a trial and acquittal, and for that reason a bar to further jeopardy, depends absolutely upon the existence of a fixed rule for determining when a discharge *is* improper, that proposition also must fall. Whatever the scope of the constitutional protection against a second trial for the same offence may be, we must hold that it is certain and unalterable by judicial practice or by legislation; and if the Constitution does not embody by implication any rule for determining when the discharge is improper; in other words for determining when the equivalent of a former trial exists, that rule, being outside of the Constitution, is open to change and modification, either by judicial practice or by legislation; so that circumstances which would be equivalent to and constitute a former trial and acquittal at one time would not do so at another. Thus a further trial would be constitutional or unconstitutional according as legislation should regulate the lawfulness of discharging the jury. Clearly the Constitution cannot be said to include the equivalent of a former trial and acquittal, when the means of ascertaining that equivalent are not governed by it.

Now, as a matter of fact, Congress has legislated upon this very subject of discharging the jury in a criminal case; not *eo nomine,* but effectively. The act of April 20, 1802, 2 Stat., 159, provided that, whenever any question should occur before a circuit court, upon which the opinions of the judges were opposed, the point of disagreement should, upon the request of either party or their counsel, be certified to the Supreme Court, and be finally decided there. The decision and order of the Supreme Court were to be remitted to the circuit court, and there entered of record and have effect. The section concluded as follows: "*Provided,* that nothing herein contained shall prevent the cause from pro-

ceeding, if, in the opinion of the court, further proceedings can be had without prejudice to the merits : *And provided, also,* That imprisonment shall not be allowed, nor punishment in any case be inflicted, where the judges of the said court are divided in opinion upon the question touching the said imprisonment or punishment." See, also, the act of June 1, 1872, ch. 255, 17th St., 197. These provisions are now embodied in sections 651 and 697 of the Revised Statutes. Under this statute, points of disagreement have repeatedly been certified to the Supreme Court, and the constitutionality of its provisions and of their consequences is not open to question. By its authority the judges might proceed with the cause, notwithstanding the matter of difference, if, in their opinion, further proceedings could be had without prejudice to the merits ; or they might discharge the jury and continue the cause, to await the decision of the Supreme Court, if they thought otherwise. Of course the latter course might involve a trial before another jury. Another act, of similar effect, was passed in 1846. The act of August 8, 1846, sec. 3, 9th St., 72, authorized the district court, when, in the opinion of the court, difficult and important questions of law were involved in the case, to remit an indictment to the circuit court ; and the proceedings thereupon were to be the same in the circuit court as if the indictment had been originally found and presented therein. This provision is still in force as section 1038 of the Revised Statutes. In United States *vs.* Morris, 1 Curtis C. C., 23, it was insisted, on the part of defendant, that the statute intended that the case should be so transferred before any proceedings subsequent to the indictment should be had in it. But Mr. Justice Curtis pointed out that the difficult and important questions referred to were not to be known by inspection of the indictment, and before examination of the case ; and especially that the statute described them as questions " involved *in the case.*" He held, therefore, that the sound construction of the clause was, that the opinion of the judge, touching the importance and difficulty of the question, was to be arrived at in the usual course of justice, after an

issue was made, "and the parties so far heard as to develop the questions which exist." Under the operation of this act, the jury is discharged simply because the district judge is of opinion that a question is difficult and important, not because he cannot decide it; and the consequence is, that accused is put on trial before another jury in the circuit court. It is to be observed that, as the jurisdiction of the district courts of the United States includes not only misdemeanors, but felonies not capital, the power exercised by Congress in this act, to determine the grounds on which a jury might be discharged and the accused again put on trial, applies to both classes of cases. The constitutionality of this act has been conclusively recognized by the courts of the United States; and, although it does not apply directly to this court, it has established a conclusion which does apply to us, namely, that neither the lawfulness of the discharge of the jury, nor the effect of an unlawful discharge to constitute an acquittal, are by implication *governed by the Constitution*, but are dependent upon the will of the legislature. It may well be said also to affirm another general principle; that the court has power to discharge a jury not merely in a case of necessity, but when, in its sound judgment, it is for the interests of justice that it should be done.

Notwithstanding these conclusions, we proceed next to consider whether what is alleged to be an improper discharge of the jury was, by the common law, equivalent to a verdict of acquittal; for upon this ground rests the assertion that it is equivalent to such a verdict in the sense of the Fifth Amendment to the Constitution. And here it may be observed that the argument touching the effect of an improper discharge always contains an assumption that the old rule, forbidding or restricting discharges, was adopted as a means of preventing the accused from being twice put in jeopardy. In other words, that it originated in the right of the prisoner to have a verdict in the first trial as a bar against a future trial for the same offence. In Conway and Lynch, Crampton, J. pointed out that this rule was part of a practice which for-

bade the adjournment of a trial, the separation of a jury, and the enjoyment of fire, light or food, until they should give in their verdict; and observed that "the principle of these severe regulations was that the non-agreement of a jury within a reasonable time, was evidence of refractoriness and perverseness on the part of the jury and a contempt for the administration of justice, and that they should therefore be coerced into agreement by personal suffering and inconvenience." 7 Ir. L. R., 169. The same solution of the old practice was stated in Charlesworth's Case, 1 Best & S., 499*. It is to be remembered, too, that the rule against discharge was originally applicable to civil as well as to criminal cases; in other words, that it was applied where it could not possibly have any reference to the right of a party to be protected against being twice put in jeopardy. Carthen, 465; Morris *vs.* Davis, 3 Car. & P., 427; 2 Hale, 297; 7 Ir. L. R., 169; 1 Best. & S., 502*. The whole practice, including the matter in question, would seem, therefore, to have been simply a set of rules concerning trial by jury; rules concerning the treatment and management of the jury and not for securing the rights of parties. Undoubtedly the particular rule in question came to serve as a protection of the prisoner in criminal cases, and, as times changed, was intentionally so used, but it did not originate in the prisoner's right, and is not to be interpreted on the ground that it had such an origin. It is shown, accordingly, in the English cases, to which we have referred, that a discharge of the jury was not at common law equivalent to acquittal. After an examination of the authorities, Crampton, J., said: "My opinion is that a premature or irregular discharge of a jury cannot be made equivalent to an acquittal by verdict." 7 Ir. L. R., 181. In Winsor's Case, Blackburn, J., after mentioning Crampton's judgment, said: "I entirely concur in the conclusion at which he arrives, that where there has not been a verdict decisive of the guilt or innocence of the prisoner, and the indictment has not been disposed of, whether it is owing to the mistake of the judge, the fault of the jury, inevitable

accident, or the improper discharge of the jury; in all these cases indifferently a *venire de novo* ought to be awarded. I am, therefore, of opinion that the discharge of the jury at the first trial was not equivalent to an acquittal." And Lush, J., said in the same case: "I, with the other members of the court, adhere to what is esteemed the very preferable judgment of Crampton, J., and we do no violence to the maxim by holding that, when the first trial has become abortive by any means whatever, the proceeding is not legally a bar to a second trial for the same offence." Mellor, J., said: "But, admitting he was wrong, and did discharge the jury erroneously, and exercised his discretion erroneously, is the discharge of the jury equivalent to a verdict? The only case in which it has been so contended, is Conway and Lynch *vs.* Reg., 7 Ir. L. R., 149. To an indictment for felony, with the exception of the plea of not guilty, I have heard only of four pleas, *autre fois acquit, autre fois convict autre fois attaint*, and a pardon being pleadable in bar. If the facts of this case cannot be brought within either of these pleas, there is no other mode of pleading them." That case taken on writ of error to the Exchequer Chamber where Erle, Ch. J., delivered the unanimous opinion of the court, in which Pollock, Chief Baron, Martin, Bromwell and Pigott, Barons, and Byles and Montague Smith, JJ., sat with him. Erle, Ch. J., said: "Even if it was assumed, for the sake of argument, that the statement on the record led the judges of the court of error to the opinion that the order for the discharge in question was an improper exercise of discretion on the part of the judge who tried the case, still we should hold that such a discharge was no legal bar to a second trial on the same or a fresh indictment. The only pleas known to the law founded upon a former trial, are pleas of a former conviction or a former acquittal for the same offence; but if the former trial has been abortive without a verdict there has been neither a conviction nor an acquittal, and the plea could not be proved. That which would be matter of plea to a fresh indictment would be ground of error upon a second trial on the same indict-

ment. As far as relates to the former abortive trial nothing which took place could be ground of error on the second trial on the same indictment, unless it would have been a bar by way of plea to a new indictment for the same offence. All the authorities are concurrent to this effect, with the single exception of Conway and Lynch, 7 Ir. L. R., 149; and we have before given our opinion on that case."

These cases show that even an improper discharge of the jury was not, by the common law, equivalent to an acquittal by verdict, and could not be set up as a defence by plea; and it is important to observe that the same authority holds that it could not therefore be alleged as error. It was simply not matter of defence, and did not show a second trial to be unlawful. The application of this conclusion is immediate. If a discharge of the jury could not in any case be counted as a first trial, with consequent acquittal, in the sense of the common law rule which prohibited a second trial for the same offence, there is no ground for holding such a discharge to be a trial and acquittal in the sense of the same rule when it is incorporated in our Constitution. In short, the alleged rule as to the discharge of a jury, with its alleged consequences, is not in any sense a part of our constitutional rule. At common law the rule that a person should not be tried twice for the same offence, and the rule concerning the discharge of a jury, whatever it may have been, were separate and distinct, and even a disregard of the one was not a violation of the other. The first was put into our Constitution; the other was not. Precisely this point was recognized by Mr. Justice Washington in Haskell's Case, 4 Wash. C. C. Rep., 410. He there said: " We are, in short, of opinion, that the moment it is admitted that in cases of necessity the court is authorized to discharge the jury, the whole argument for applying this article of the Constitution to a discharge of the jury before conviction and judgment is abandoned, because the exception is not to be found in any part of the Constitution. * * We admit the exception, but we do it because that article does not apply to a jeopardy short of conviction." This statement is in effect a distinct denial

that the constitutional rule applies to any case of abortive trial. We are aware that the learned judge seemed to admit afterwards that an improper discharge of the jury might, nevertheless, be reached as matter of error at common law; but we concur in the contrary position of Erle, C. J., in Winsor's Case, and we think that Mr. Justice Washington's intimation was not supported by the decision of the Supreme Court in Perez's Case, 9 Wheaton, 579. The court there said: We think that in all cases of this nature, the law has invested courts of justice with authority to discharge a jury from giving a verdict, whenever, *in their opinion*, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define *all the circumstances* which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances and for very plain and obvious reasons; and, in capital cases especially, courts should be extremely careful how they interfere with any chances of life in favor of the prisoner. *But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion rests, in this as in other cases, upon the responsibility of the judges, under their oaths of office.*"

It was claimed, in the argument, that when the court said that the law had invested courts of justice with authority to discharge the jury "in all cases of this nature," they referred only to cases where the jury were unable to agree; but Mr. Justice Curtis said, in United States *vs.* Morris, 1 Curt. C. C., 36, that they were speaking of capital cases; and several expressions in the passage we have just quoted show that they intended to state a rule applicable to all cases. The "circumstances" and "causes," to which courts should look, were not intended to be restricted to the circumstances of non-agreement. The point, however, to which we refer is, that the Supreme Court must be understood to have held that this matter of the discharge of the jury was

not controlled by the Constitution. And they plainly in-
timated that the exercise of the power to discharge was
matter of discretion and not matter of error, when they said
that "the security which the public have for the faithful,
sound and conscientious exercise of this discretion, rests, in
this, as in other cases, *upon the responsibility of the judges,
under their oaths of office.*" It was with a distinct reference
to this case, that Mr. Justice Curtis said, in United States
*vs.* Morris, that, "in all cases within the jurisdiction of the
district court, it is in the power of that court, as it is in the
power of the circuit court, even in capital cases, to take the
case from a jury impanelled to try it, whenever, in the
opinion of the court, it is necessary, or required by *the in-
terests of justice* to do so;" and, in a later passage, that, "the
finding of a cause for withdrawing a juror, or taking a case
from a jury, is a judicial act; the authority to do it is en-
trusted to that court, and no other court can revise its de-
cision."

In accordance with these decisions, we hold that no rule
touching the discharge of the jury has, by implication, been
incorporated in or referred to by the constitutional rule to
which the defendant appeals; that the courts of the United
States are invested with power to determine conclusively,
in the trial of a criminal cause, when the interests of public
justice require that the jury shall be discharged, and that,
consequently, such a discharge is not in any case equivalent
to a verdict of acquittal, or a defence against a further trial
upen the same or a new indictment. Whenever this power
shall appear to be dangerous in the hands of the judges, it
can be restricted or regulated by Congress; for the whole
subject, not being an implied term of the constitutional pro-
vision, is subject to legislative control. That it has yet
proved to be dangerous, or that it is likely to be so, we do
not conceive to be a matter worthy of discussion.

It will be understood, of course, that we do not regard the
power to discharge a jury without a verdict as containing
the slightest element of arbitrary choice. The discretion
to apply it is one which the trial justice must use under a

solemn obligation to satisfy his judgment that such a course is required by the interests of justice; and even as to this there are well established limitations which he is not at liberty to disregard. It would be inexcusable, for example, to discharge a jury, with a view to a further trial, because the Government is not prepared to go on with the prosecution; and it would be in the power, and would be the duty of the same judge, or of another judge who might be called upon to try the prisoner, after such a discharge, to enter a *nolle*. As to the discharge in the case before us, we may remark that the bill of exceptions, in which the circumstances are set forth, does not show that it was ordered merely for purposes of convenience. The true purpose and ground of the discharge are disclosed by the order made immediately afterwards, and before the reswearing of the jury, by which the consolidation of the fourteen indictments was dissolved. It is apparent that the judge who tried the cause decided that the interests of justice required such separation of the indictments, and to that end a discharge of the jury. Inasmuch as the prisoner was tried by the very jurors whom he had just accepted, and before his witnesses were allowed to disperse, the only practical change in his position was, that he was tried on one selected indictment, instead of being tried upon that and other indictments consolidated. One of the indictments thus excluded was found under a statute which allowed a longer imprisonment than is provided by the statute under which he was actually tried.

Judgment affirmed.